**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

**PEPPERS UNLIMITED OF LOUISIANA INC**       **CASE NO.  6:23-CV-01281**

**VERSUS**                                   **JUDGE ROBERT R. SUMMERHAYS**

**MARKETPLACE BRANDS L L C**                 **MAGISTRATE JUDGE DAVID J. AYO**

### MEMORANDUM RULING

Peppers Unlimited of Louisiana, Inc. ("Peppers") filed the present action against Marketplace Brands, LLC ("Marketplace") alleging that Marketplace failed to pay for the pepper sauce that it received. The parties do not dispute that Marketplace attempted to make the payments at issue, but the majority of those payments were not received by Peppers because they were diverted to third-party imposters posing as employees of Peppers. Peppers asserts a claim under the Louisiana Open Account Statute and claims for breach of contract and unjust enrichment. The Court took the case under advisement after a bench trial and ordered the parties to submit post-trial briefing and amended proposed findings of fact and conclusions of law. After considering the trial record, the parties' briefing, and the relevant authorities, the Court rules as follows.

**I.**
**THE TRIAL RECORD AND THE COURT'S FINDINGS OF FACT**

1.      Peppers is a Louisiana company that produces pepper sauce and other food products.[1] Peppers employs approximately 200 people at its manufacturing plant and

---

[1] Jt. Stip. ¶ 3.

1

administrative offices in St. Martinville, Louisiana.[2] As of 2022, Peppers had approximately 400 customers.[3]

2.      Leslie Willis is Peppers' Chief Executive Officer and John Bulliard is its Chief Operating Officer. Peggy Marler is Peppers' Secretary and Treasurer and has served in the position of Controller and is currently the company's Chief Financial Officer. Keely Guirard is Peppers' Assistant Controller.[4]

3.      Marketplace is a food product design, packaging, and distribution company that specializes in creating and distributing seasonal gift packages containing food products for sale at major retail chains including Sam's Club, Costco, and Walmart.[5] It is an Illinois limited liability company headquartered in Elk Grove, Illinois, a suburb of Chicago, and was founded in 2010.

4.      Marketplace is wholly owned by Andrzej Koziarski. Koziarski founded Marketplace and serves as its Chief Executive Officer.[6] Hanna Pyzikiewicz is the Chief Operating Officer of Marketplace and was one of the company's first employees. Margaret Przybylko is Marketplace's Controller and has been employed by the company since 2022.[7]

5.      Marketing Creators, Inc. ("Marketing Creators"), is a marketing and sales company that Peppers uses to market Peppers' products to potential customers and to manage its customer relationships.[8] Peppers has no ownership interest in Marketing Creators, and Marketing Creators

---

[2] Willis, Tr. 48:7- 12.
[3] Willis, Tr. 49:17.
[4] Jt. Stip. ¶ 4; Willis, Tr. 45:24, 49:21-24, 61:6; Marler, Tr. 190:21-23.
[5] Jt. Stip. ¶ 6; Koziarski, Tr. 692:2-8.
[6] Jt. Stip. ¶ 6.
[7] Jt. Stip. ¶ 7.
[8] Willis, Tr. 50:11-12, 16-19; Kolb, Tr. 235:16.

has no ownership interest in Peppers.[9] Jennifer Kolb and Kristen Lowrie are employed by Marketing Creators.[10] Neither have ever been employed by Peppers.[11]

6.      At all relevant times, when Kolb and Lowrie communicated by email with Peppers' customers, including Defendant Marketplace, they did so using a "peppersla.com" email domain. They also used "signature blocks" on their email messages that affiliated them with Peppers, and they held themselves out to customers as Peppers' representatives.[12]

7.      Peppers and Marketplace began doing business together in 2014, when Marketplace first started ordering private-labeled, bottled pepper sauce products from Peppers. From 2014 until the events leading to this litigation, Peppers and Marketplace maintained a continuous manufacturer-customer relationship.[13]

8.      Jennifer Kolb served as Peppers' account manager for the Marketplace account and her employer, Marketing Creators, was paid on a commission basis. Kristen Lowrie acted as an alternate contact when Kolb was unavailable.[14] Kolb and Lowrie collectively were the primary points of contact between Peppers and Marketplace.[15]

9.      The evidence shows that Marketplace was historically slow in paying Peppers' invoices throughout its relationship with Peppers.[16]  Marketplace attributes the payment delays to the seasonal nature of its business—a high business volume in the second half of each calendar year that caused cash flow challenges during other times of the year.[17]

---

[9] Lowrie Dep. 28:2-11.
[10] Jt. Stip. ¶ 5; Willis, Tr. 51:12.
[11] Willis, Tr. 50:25 – 51:1; Kolb, Tr. 235:13-22; Lowrie Dep. 8:19-24.
[12] Jt. Stip. ¶ 5; Willis, Tr. 82:1-2; Kolb, Tr. 236:20-22, 237:2.
[13] Jt. Stip. ¶ 8; Willis, Tr. 51:19-21, 52:6.; Kolb, Tr. 238:9.
[14] Willis, Tr. 54:3-7; Kolb, Tr. 238:24-25; Lowrie Dep. 24:13-17, 75:9-10.
[15] Jt. Stip. ¶ 9.
[16] Willis, Tr. 56:4-16; Marler, Tr. 192:13-19; Kolb, Tr. 252:14- 25.
[17] Koziarski, Tr. 649:23 – 650:2.

10.     Marketplace was a modest customer of Peppers up to 2022. In 2022, Marketplace significantly expanded its relationship with Peppers.[18] As this business relationship expanded in 2022, Marketplace failed to timely pay some of its invoices from Peppers.[19] On April 11, 2022, Kolb asked Pyzikiewicz to supply documentation of Marketplace's bank line of credit.[20] Kolb told Pyzikiewicz that this evidence was necessary before Peppers would authorize the production of the 2022 orders.[21]

11.     In March 2022, Marketplace requested that Peppers produce private-label, bottled pepper sauce products which Marketplace would include in its gift pack offerings for resale during the 2022 holiday season. This request is reflected in a March 22, 2022, email from Koziarski to Kolb, authorizing Peppers to start production and to secure the necessary raw materials.[22] The parties' agreement is memorialized in several purchase orders issued by Marketplace between March and August 2022.[23]

12.     Marketplace's 2022 orders from Peppers were typical in that Marketplace issued multiple purchase orders to Peppers, specifying the products that it wanted Peppers to produce for it.[24] Each time Peppers shipped products to Marketplace, Peppers followed its standard procedure by issuing an invoice to Marketplace.[25] In 2022, Peppers made dozens of product shipments to Marketplace and issued 41 separate invoices for those shipments.[26] Peppers produced, sold, and delivered products to Marketplace under its purchase orders from June 2022 to November 2022.[27]

---

[18] Willis, Tr. 53:10-16.
[19] Kolb, Tr. 253:8-11, 257:12-14.
[20] PX-3 at 3; Kolb, Tr. 250:21 – 251:20; Koziarski, Tr. 692:23-25.
[21] *Id*.
[22] Kolb, Tr. 240:24 – 241:6; PX-1 at 1.
[23] PX-1 at 2-14; Willis, Tr. 54:16-22, 55:9-10; Pyzikiewicz Dep. 42:5-7; Kolb, Tr. 244:22 – 246:8.
[24] PX-1 at 2-14; Willis, Tr. 54:16-22, 55:5, 9-10; Kolb, Tr. 241:4-6, 244:22 – 246:8; Pyzikiewicz Dep. 42:5-7.
[25] Willis, Tr. 55:16-17; Jt. Stip. ¶ 12.
[26] Willis, Tr. 59:9-10; Jt. Stip. ¶ 14; PX-153.
[27] Jt. Stip. ¶ 11.

All 41 invoices issued by Peppers to Marketplace from June to November 2022 included this language in uppercase font:

> A SERVICE CHARGE WILL BE ASSESSED ON LATE PAYMENTS AT THE RATE OF 1 ½% PER MONTH (18% PER ANNUM). IF THE ACCOUNT IS PLACED WITH AN ATTORNEY FOR COLLECTION OR SUIT, REASONABLE ATTORNEY FEES MAY BE ASSESSED.[28]

13.    On June 29, 2022, Kolb sent an email to Koziarski regarding overdue invoices from May 2, 2022. Kolb requested that Koziarski "advise when these will be paid."[29] Koziarski replied that the "check will go out tomorrow."[30] Two weeks later, on July 14, 2022, Kolb emailed Koziarski again about the overdue invoices, stating, "we have not received another payment."[31] Kolb identified 26 invoices that were more than 30 days overdue, including six invoices that were over 60 days past due.[32]

14.    A week later, on July 21, 2022, Kolb again emailed Koziarski about Marketplace's overdue account, stating that the invoices needed to be "cleared up immediately" or Marketplace's account would be placed on hold because Marketplace was "overdue over a million dollars."[33] Kolb stated that, unless Marketplace paid the overdue invoices, "we are going to be fighting your account being put on hold" – which meant that Peppers would suspend production of the pepper sauce products Marketplace had ordered.[34] On July 22, 2022, Koziarski responded to Kolb, promising to investigate "what is going on with the check" that he had promised on June 30 would "go out tomorrow."[35] Koziarski also stated that Marketplace "will pay this all soon" and requested

---

[28] Jt. Stip. ¶ 17; PX-153.
[29] PX-4 at 2.
[30] *Id.*
[31] PX-4 at 1; Kolb, Tr. 256:4-8.
[32] PX-4 at 1.
[33] PX-5 at 1; Kolb, Tr. 253:12-17, 256:21-24.
[34] *Id.*; Kolb, Tr. 256:21-24.
[35] PX-5 at 1.

that Peppers not place Marketplace's account "on hold."[36] As of August 5, 2022, Marketplace owed more than $600,000 on Peppers' invoices that were overdue more than 60 days.[37]

15.    Prior to August 22, 2022, Marketplace paid Peppers' invoices solely by check.[38] On August 5, 2022, Koziarski sent an email to Kristen Lowrie, Peppers' representative, notifying her that a check for $215,917.81 had been mailed to Peppers and an additional check for $191,351 was issued to settle outstanding invoices.[39] However, on August 17, Marketplace Controller Przybylko emailed Lowrie and informed her that the $215,917 check had been dishonored by Marketplace's bank.[40] On August 18, 2022, Keely Guirard, Peppers' Assistant Controller, telephoned Przybylko and left her a voicemail about the returned check.[41] After a phone call between Przybylko and the Peppers' accounting department about the dishonored check, Marketplace agreed to pay Peppers' invoices by wire transfer.[42]

16.    On August 23, 2022, Guirard emailed Marketplace's Przybylko, attaching Peppers' First Horizon Bank ACH/wire transfer instructions.[43] The ACH/wire transfer instructions Guirard sent on August 23 included specific contact information, as follows:

> Please contact Peggy Marler or Keely Guirard at 337-394-8035 if you have any questions. Please email any remit information or deduction information to the following email addresses: Peggy@peppersofla.com and Keely@peppersofla.com.[44]

---

[36] Id.
[37] PX-6 at 7.
[38] Jt. Stip. ¶ 23.
[39] PX-7.
[40] PX-8.
[41] PX-9, PX-10.
[42] Przybylko, Tr. 593:3-5, 594:17-25; Marler, Tr. 195:22-23, 196:7-9, 197:11-13.
[43] Jt. Stip. ¶ 24; JX-3.
[44] JX-3 at 2; Marler, Tr. 198:10-16.

On August 23, 2022, Koziarski sent an email to Guirard to confirm Marketplace had sent a wire transfer of $215,917.81 to First Horizon Bank.[45] After 4:40 p.m. on that day, the funds were wired to Peppers' First Horizon account.[46]

17.     At some point in August of 2022, one or more unidentified third parties who had no known affiliation or relationship with either Peppers or Marketplace posed as Marketplace employees as part of an apparent scheme to divert Marketplace's wire transfers that were intended for Peppers. Peppers discovered in October of 2022 that John Bulliard's e-mail account had been hacked.[47]  Jason Hale, a security expert, opined that Mr. Bulliard's email likely had been hacked prior to August 29, 2022, and was the entry point used by the third-party imposters to obtain information about the business relationship between Peppers and Marketplace.[48]

18.     Near the end of August of 2022, the imposters created two "typosquatting" domains to mimic both Peppers and Marketplace.[49] The domain "pepppersofla.com" was registered on August 29, 2022.[50] The domain "marketplasebrands.com" was registered on August 30, 2022, roughly 23 hours after "pepppersofla.com" was created.[51] Neither Peppers nor Marketplace registered either of these domain names.[52] The domain "pepppersofla.com" employed "typosquatting" by adding an extra "p" to the legitimate domain "peppersofla.com." The domain "marketplasebrands.com" employed typosquatting by substituting an "s" for the "c" in the legitimate domain "marketplacebrands.com."[53]

---

[45] Jt. Stip. ¶ 25; JX-5 at 1.
[46] Jt. Stip. ¶ 25; PX-15 at 3-4; JX-56 at 11-12 (MKT0394); Marler, Tr. 200:18-23.
[47] Morrison, Tr. 402:12-14.
[48] Hale, Tr. 425:7-427:9; 430:1-4
[49] PX-128, PX-129; Hale, Tr. 495:23 – 496:12.
[50] PX-128 at 1.
[51] PX-129 at 1; Hale, Tr. 430:8-14.
[52] PX-128; PX-129; Hale, Tr. 429:17-22; Willis, Tr. 81:15-18; 88:10-13..
[53] Hale, Tr. 496:1-9.

19.     Both domains were used in a "business email compromise" ("BEC") scam. The imposters launched their BEC attack on August 29, 2022, by utilizing the domain "@pepppersofla.com" and inserting themselves into legitimate email communications between Marketplace and Peppers.[54] This scam functioned as a "man-in-the-middle" operation where the imposters simultaneously impersonated employees from both companies.[55] The imposters successfully replicated genuine email formats and "signature blocks" from the actual representatives of both organizations.[56] This tactic allowed them to control communications between Marketplace and Peppers. Specifically, they created fraudulent email accounts that imitated those of employees from Peppers' marketing contractor, Marketing Creators, namely Jennifer Kolb and Kristen Lowrie.[57]  They also posed as Marketplace employees Koziarski, Pyzikiewicz, and Przybylko when communicating with Peppers' representatives.[58]

20.     On August 29, 2022, the imposters implemented their scheme by using the fraudulent "kristen@pepppersofla.com" address (which attempted to mimic e-mails from Kristin Lowery) to email Marketplace's COO Hanna Pyzikiewicz.[59] The fake email stated:

> Dear Hanna,
>
> We have just updated our banking details due to recent auditing and tax hike on our old account, and we have decided to receive further payment through our updated banking details Via Ach/Wire kindly advise on the next payment schedule and what you need from us to set up this new payment information. We expect your urgent response as this is very important for our company.
>
> Thanks.[60]

---

[54] JX-7; Hale, Tr. 426:21 – 427:5, 429:17-25.
[55] Jt. Stip. ¶ 26; Hale, Tr. 499:21-23, 500:5-13.
[56] Hale, Tr. 426:21 – 427:5; Willis, Tr. 99:24 – 100:2; Kolb, Tr. 276:5-9.
[57] Jt. Stip. ¶ 26; Kolb, Tr. 275:23 – 276:1.
[58] Jt. Stip. ¶ 26; Kolb, Tr. 283:6- 9, 288:15-17.
[59] JX-7
[60] Jt. Stip. ¶ 29; JX-7; Pyzikiewicz Dep. 75:14-24.

The fake Lowrie email purported to include Kolb as a "cc" recipient but that email address was also one of the fake email addresses.[61] Neither Kristen Lowrie nor Jennifer Kolb received a copy of the August 29 email,[62] on that date.[63] The body of the email contained Kristen Lowrie's "signature block," which featured her legitimate email address, "kristen@peppersla.com."[64] It also included two authentic telephone numbers for Lowrie.[65]

21.    Upon receiving the fake August 29 Lowrie email, Marketplace COO Pyzikiewicz forwarded the email thread to the company's Controller, Przybylko.[66] In her forwarding message, Pyzikiewicz did not question the email's authenticity but simply wrote, "please advise."[67] She also did not check the sender's email address to verify its authenticity before forwarding it.[68] Przybylko made no attempt to verify the authenticity of the sender's email address.[69] Instead, she replied to the imposters posing as Lowrie at "kristen@pepppersofla.com," acknowledging the receipt of the email regarding the "banking change."[70] In her reply to the forwarded message, Przybylko addressed "kristen@pepppersoflacom," stating: "Good afternoon Kristen, Thank you for the update. We have noted the change and will make the appropriate adjustments."[71]

22.    On August 30, 2022, a second fake email was sent from "kristen@pepppersofla.com" to Przybylko in response to Przybylko's email from that same day at 10:58 AM. The message read: "Thank you margaret, look forward to receiving your feedback."[72]

---

[61] Jt. Stip. ¶ 27; Kolb, Tr. 236:20, 275:25 – 276:1.
[62] Exhibit JX-7.
[63] Kolb, Tr. 276:10-14; Lowrie Dep. 37:11-21, 38:6-9.
[64] Kolb, Tr. 276:5-7.
[65] JX-7; Willis, Tr. 100:25 – 101:8; Kolb, Tr. 276:5-9.
[66] JX-8; PX-21; Pyzikiewicz Dep. 79:7-9.
[67] Pyzikiewicz Dep. 79:7- 9, 80:1-3.
[68] Pyzikiewicz Dep. 71:12-13, 71:16-17.
[69] Przybylko, Tr. 600:19-22.
[70] JX-9.
[71] *Id.*
[72] PX-19 at 1.

23. Fraudulent emails from the "pepppersofla.com" domain, utilizing "kristen@pepppersofla.com" or "jenn@pepppersofla.com," persisted from August 29, 2022, through January 2, 2023.[73] During this period, Marketplace personnel received 66 emails from this fraudulent domain,[74] and, unaware of the deception, sent 79 emails to "Jenn" or "Kristen" at the same fraudulent domain ("@pepppersofla.com").[75] Fraudulent emails in August and early September 2022 frequently mimicked internal Peppers communication by including "jenn@pepppersofla.com," "kristen@pepppersofla.com," "leslie@pepppersofla.com," "peggy@pepppersofla.com," and "john@pepppersofla.com" in the "CC" line.[76] However, several emails, including the August 29, 2022, message which notified Marketplace that Peppers' banking information had been changed,[77] listed Peppers' COO John Bulliard with his correct email address as a "cc" recipient.[78]

24. On August 31, 2022, Andy Koziarski of Marketplace responded to the false "updated banking details email," adding Jennifer Kolb, Peppers' Director of Business, to the thread at her legitimate email address jenn@peppersla.com.[79] Accordingly, Jennifer Kolb received a copy of the email from the imposters with the subject line "Updated Banking Details" and indicating that Peppers' banking information for wire payments was being changed.[80] Ms. Kolb responded Mr. Koziarski's specific question in the email thread on August 31, 2022, but did not address the original subject of the email thread regarding a change in banking details.[81] Marketplace made its

---

[73] PX-149, PX-150.
[74] PX-149; Przybylko, Tr. 601:18-21.
[75] PX-150; Przybylko, Tr. 602:2-10, 20-22.
[76] See JX-7, PX-56.
[77] JX-7.
[78] JX 7; Willis, Tr. 101:21-25.
[79] JX 11.
[80] *Id*.
[81] JX 10; Kolb, Tr. 331:20-332:2.

first electronic transfer to the imposters' account on September 16, 2022, in the amount of $24,450.39.

25.    In October 2022, after Marketplace had made three payments to the imposters' Wells Fargo account, Peppers became aware that (1) John Bulliard's email had been compromised and (2) its customers were receiving fraudulent payment-related emails, including an email giving notice of changed banking details for Peppers, from both John Bulliard's legitimate email account and other counterfeit Peppers email addresses.[82]

26.    On October 17, 2022, a customer forwarded an email to Jennifer Kolb with the fraudulent domain name "jenn@pepersla.com."[83] On October 19, 2022, another customer forwarded an email to Ms. Kolb with the same fraudulent domain.[84] Ms. Kolb responded that same day, stating "[t]hat is really strange . . . I did not send that e-mail." The customer explicitly pointed out that the sender's email address was incorrect: "look at the e-mail address below. They say @ pepersla.ca. [sic]." Ms. Kolb did not reach out to Peppers' customers to alert them about email hack.[85]

27.    On October 20, 2022, another customer contacted Ms. Kolb to inform her that they received phishing emails from her and John Bulliard "requesting to change [their] bank account information." Ms. Kolb responded "thank you for letting me know. I definitely did not send anything out like that."[86]

---

[82] JX 31; JX 32; JX 33; JX 34; Kolb, Tr. 333:12-334:1; 334:5-336:7; 336:25-337:3; 350:25-351:2.
[83] JX 31; Kolb, Tr. 333:12-334:1.
[84] JX 32.
[85] *Id.*; Kolb, Tr. 334:5-335:8.
[86] JX 33.

28.     On October 20, 2022, Ms. Kolb notified Peppers' CEO, Leslie Willis, that John Bulliard's email had been hacked.[87] Ms. Willis did not instruct Ms. Kolb to reach out to Peppers' customers to warn them of the fraud.[88] Ms. Willis reached out to Peppers' IT consultant, Charles Morrison to "advise what needs to be done."[89] Less than two hours later, Mr. Morrison responded in an email with the subject line "Hacked email addresses."[90] Mr. Morrison informed Ms. Willis that Mr. Bulliard's genuine address had been used to target at least six unsuspecting Peppers' customers, and included a screenshot of the outbound emails sent from Mr. Bulliard's account.[91] These outgoing emails included both fraudulent domains—the Peppers email domains with one and three "p's"—that had been used to reach out to Peppers' customers, including Marketplace.[92]

29.     In response to this information, Mr. Morrison changed Mr. Bulliard's password and reviewed his outbound emails.[93] Ms. Willis asked Peppers' employees to change their email passwords.[94] On October 24, 2022, Ms. Kolb notified yet another customer to "please disregard the previous e-mail. John's e-mail was hacked."[95]  No notice was sent to other Peppers' customers.[96]

30.     In February 2023, Peppers sent an email to all customers warning them of the scheme and added a warning at the bottom of employee email signatures.[97] On March 10, 2023,

---

[87] JX 34.
[88] Kolb Tr. 336:25- 337:3.
[89] JX 36.
[90] JX 37.
[91] *Id.*
[92] *Id.*
[93] Morrison, Tr. 402:15-18.
[94] Willis, Tr. 129:1-7; 144:5-6.
[95] JX 40.
[96] Kolb Tr. 337:4-338:1.
[97] DX 5.

Ms. Willis directed Ms. Kolb and Ms. Lowrie to "go through your emails to make sure there's no other fraud going on with other customers." [98]

31.     Marketplace made the following electronic funds transfers to the third-party imposters' Wells Fargo account:

1. 9/16/2022: $24,450.39 (using Marketplace's JPMorgan Chase account);

2. 9/30/2022: $81,909.27 (from JPMorgan Chase account);

3. 10/7/2022: $82,762.50 (from JPMorgan Chase account);

4. 10/21/2022: $77,691.62 (from JPMorgan Chase account);

5. 10/28/2022: $198,555.79 (using Marketplace's Byline Bank account);

6. 11/4/2022: $97,267.98 (from Byline Bank account);

7. 11/14/2022: $118,621.67 (from Byline Bank account);

8. 11/21/2022: $105,269.15 (from Byline Bank account);

9. 11/28/2022: $91,917.34 (from Byline Bank account);

10. 12/2/2022: $77,643.17 (from Byline Bank account); and

11. 12/9/2022: $90,936.26 (from Byline Bank account).[99]

These transfers totaled $1,047,024.84.[100]

32.     The record shows that Peppers issued the following invoices to Marketplace:

a.      In June 2022, Peppers issued two invoices to Marketplace: Invoice No. 2206441 dated June 22, 2022, for $40,101.42, and Invoice No. 2206512 dated June 24, 2022, for $38,394.97.[101]

---

[98] DX 30.
[99] Jt. Stip. ¶ 31.
[100] Id. ¶ 33.
[101] Jt. Stip. ¶ 14(a).

b.      In July 2022, Peppers issued seven invoices to Marketplace: three invoices (Nos. 2207022, 2207023, and 2207024) on July 1, 2022, totaling $119,450.66; two invoices (Nos. 2207043 and 2207044) on July 5, 2022, amounting to $81,381.44; and two invoices (Nos. 2207407 and 2207408) on July 22, 2022, totaling $79,327.87.[102]

c.      In August 2022, Peppers issued two invoices to Marketplace: Invoice No. 2208446 on August 23, 2022, for $44,436.66, and Invoice No. 2208532 on August 26, 2022, for $40,505.57.[103]

d.      In September 2022, Peppers issued 13 invoices to Marketplace: Invoice No. 2209051 on September 2, 2022, for $40,024.43; two invoices (Nos. 2209204 and 2209205) on September 13, 2022, totaling $81,909.27; two invoices (Nos. 2209247 and 2209248) on September 14, 2022, amounting to $83,615.72; Invoice No. 2209293 on September 16, 2022, for $40,101.42; four invoices (Nos. 2209349, 2209350, 2209351, and 2209352) on September 20, 2022, totaling $157,965.04; two invoices (Nos. 2209365 and 2209366) on September 21, 2022, amounting to $81,909.28; Invoice No. 2209386 on September 22, 2022, for $39,638.45; Invoice No. 2209501 on September 26, 2022, for $40,339.85; and Invoice No. 2209576 on September 28, 2022, for $18,220.24.[104]

e.      In October 2022, Peppers issued fourteen invoices to Marketplace: Invoice No. 2210068 on October 5, 2022, for $38,707.89; two invoices (Nos. 2210129 and 2210130) on October 7, 2022, totaling $39,336.22; Invoice No.

---

[102] Jt. Stip. ¶ 14(b).
[103] Jt. Stip. ¶ 14(c).
[104] Jt. Stip. ¶ 14(d).

2210206 on October 11, 2022, for $38,568.18; four invoices (Nos. 2210262, 2210263, 2210264, and 2210265) on October 12, 2022, amounting to $119,448.87; Invoice No. 2210372 on October 18, 2022, for $41,289.30; Invoice No. 2210441 on October 21, 2022, for $37,064.17; and three invoices (Nos. 2210588, 2210589, and 2210590) on October 28, 2022, totaling $117,744.59.[105]

f.      In November 2022, Peppers issued three invoices to Marketplace: Invoice No. 2211032 on November 1, 2022, for $38,394.97; Invoice No. 2211053 on November 2, 2022, for $39,641.66; and Invoice No. 2211090 on November 3, 2022, for $12,926.63.[106]

These invoices total $1,550,444.77. In September 2022, Marketplace made a partial payment, which Peppers received in the amount of $15,702.13.

33.     Koziarski testified that he first discovered that over $1 million in payments intended for Peppers had been sent to a fraudulent account on or about January 5, 2023.[107] Peppers first became aware that Marketplace had fallen for the BEC fraud on or about the same date. Upon discovering the fraud, Marketplace contacted its banks, Chase Bank and Byline Bank, to report the fraudulent wires and to attempt to recover the misdirected funds.[108]

34.     On February 7, 2023, Koziarski filed a formal complaint with the FBI's Internet Crime Complaint Center on Marketplace's behalf,[109] Koziarski confirmed that one of

---

[105] Jt. Stip. ¶ 14(e).
[106] Jt. Stip. ¶ 14(f).
[107] Koziarski, Tr. 685:1-4.
[108] Koziarski, Tr. 688:15-18.
[109] PX-118; Koziarski, Tr. 706:15-16.

Marketplace's banks, Byline Bank, successfully recovered $36,287.83 of the stolen funds which were ultimately transmitted to Peppers on October 22, 2024.[110]

35.     The parties also dispute the amount of credit due for glass bottles and caps supplied by Marketplace to Peppers in 2022. At the beginning of the parties' business relationship, Peppers supplied the bottles and caps for the pepper sauce ordered by Marketplace. However, at times, Peppers was unable to procure these materials. When that occurred, the parties reached an agreement, and Marketplace sometimes supplied the bottles and received a credit for the cost of the bottles.

36.     On June 7, 2022, Kolb emailed Koziarski and Pyzikiewicz at Marketplace to tell them that Peppers could not obtain the same bottles they had been using to produce products for Marketplace.[111] Marketplace previously sourced bottles for Peppers in 2021. At that time, the total cost of bottles, caps, and freight delivered to St. Martinville, Louisiana, was approximately 15 cents per bottle.[112]

37.     In a June 30, 2022 email addressing the need for Marketplace to source bottles again, Marketplace's Koziarski suggested that there could be additional costs in sourcing the bottles.[113] He stated that having to reroute and repackage the bottles in Chicago would "add some costs, but . . . not be more than a couple of pennies per bottle."[114] Beginning in September 2022 Marketplace began taking credits against Peppers' invoices calculated at 28 cents per unit (including caps and freight charges).[115] Specifically, on September 12, 2022, Marketplace issued

---

[110] Koziarski, Tr. 688:22-25.
[111] Jt. Stip. ¶ 13.
[112] Koziarski, Tr. 669:3-6; Kolb, Tr. 291:5-10.
[113] JX-2.
[114] JX-2; Kolb, Tr. 296:6-9; Koziarski, Tr. 670:22- 25.
[115] Przybylko Tr. 570:2-6; Kolb, Tr. 298:24-299:1.

16

five documents, each entitled "Bill Credit," for bottles it sourced for use by Peppers.[116] The documents calculated the credits at 25 cents per bottle and 3 cents per cap for a total of 28 cents per unit. The "credit" documents were sent to Kolb, who forwarded them to Peppers CEO Willis.[117]

38.    In response, Kolb wrote Przybylko and Koziarski, stating: "I thought we agreed to split the cost of the glass?"[118] A few days later, Kolb wrote again and asked, "did you adjust your credits?"[119] Koziarski responded on September 21st and stated "I was under impression that we will charge you for the glass and pay for the delivery of them. Can we leave it like that?"[120]

39.    The next day, September 22nd, Koziarski received an email from the imposter using "jenn@pepppersofla.com," stating that "the most" Peppers would agree to cover "on the glass" was 17 cents per bottle.[121] Koziarski believed the sender was Kolb.[122] Kolb actually wrote the email, but it was intercepted by the imposter, who then sent it through the @pepppersofla.com domain.[123] Kolb restated Peppers' position on October 10th, when she wrote that "[t]he most we can pay for the glass is $.17 …."[124]  On October 11th, Koziarski responded: "this is lower than what we paid for. Can you do it a little higher."[125] In response, the legitimate Jennifer Kolb emailed the fraudulent address for Koziarski (@marketplase.com) stating that a total of $0.19 – with caps – was the maximum amount Peppers would be able to pay.[126]

---

[116] JX-17.
[117] JX-18; Kolb, Tr. 287:16-18; Willis, Tr. 133:17; 63:1- 3.
[118] PX-69 at 1, JX-21 at 2.
[119] Id.
[120] PX-79 at 2, JX-21 at 1.
[121] PX-79 at 1, JX-21 at 1.
[122] Koziarski, Tr. 675:16-21.
[123] JX-22; Kolb, Tr. 301:11-25.
[124] JX-26 at 2.
[125] JX-26 at 2; Koziarski, Tr. 677:24-678:9.
[126] PX-81 at 1; Kolb, Tr. 304:8-10; Koziarski, Tr. 679:15 – 680:8.

40.     During the negotiation, Koziarski asked if Peppers could "at least get to 26 cents with the cap."[127] Kolb explicitly rejected Koziarski's 26-cent proposal, replying, "I can't even get close to that." She then made a final counteroffer: "I might be able to get them to agree to 20 cents."[128] Koziarski testified that he did not respond to the final 20-cents-per-unit offer from Kolb.[129] There was no further communication from Marketplace accepting, rejecting, or disputing this final number.[130]

41.     In addition to the initial five credit memos, on September 16, 2022, Przybylko sent an additional six credit memos; unfortunately, those emails went to the imposters impersonating Kolb and Lowrie – but not to anyone at Marketing Creators or at Peppers.[131] In late 2022, Marketplace sent Peppers several hundred thousand additional bottles and caps, exceeding those mentioned in the five credit memos. Peppers did not utilize these bottles for filling Marketplace's orders since it had received an alternate supply.[132]

42.     After learning about the total number of bottle shipments sent by Marketplace, Peppers proposed a solution for the surplus bottles.[133] In a letter dated March 24, 2025,[134] Peppers suggested returning about 948,000 unused bottles and caps to Marketplace and offered to deliver them to Marketplace's new pepper sauce supplier, located within a 100-mile radius of Peppers' St. Martinville site.[135] Marketplace did not respond to Peppers' proposal.[136] The bottles available for return were replacements, as the original bottles provided by Marketplace had already been used

---

[127] JX-30 at 1; Koziarski, Tr. 679:19- 21.
[128] JX-28 at 1, JX-30 at 1; Kolb, Tr. 303:20-23; Koziarski, Tr. 680:2-8.
[129] JX-28, JX-30.
[130]  Kolb, Tr. 305:4-6; Koziarski, Tr. 680:6-12.
[131] DX-22; Willis, Tr. 159:7-14; Przybylko, Tr. 571:6-23.
[132] Willis, Tr. 163:24-25.
[133] Willis, Tr. 164:1-3.
[134] DX-40.
[135] DX-40; Willis, Tr. 164:18-23.
[136] Willis, Tr. 165:6-13.

for other customers' orders, and Peppers had this surplus inventory because Marketplace was no longer a customer.[137] Marketplace shipped a total of 1,738,044 bottles to Peppers in 2022.[138]

43.     On May 23, 2023, Peppers sent Marketplace a written demand letter setting forth the outstanding amount owed of $1,376,844.24, which Marketplace received.[139] Marketplace did not respond to the demand letter.[140]

44.     On or about August 2, 2023, Peppers filed a state court petition captioned *Peppers Unlimited of Louisiana, Inc. v. Marketplace Brands, L.L.C.*, Case No. 093064, in the 16th Judicial District Court, Parish of St. Martin, State of Louisiana.[141] On September 14, 2023, Marketplace filed a Notice of Removal pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.[142]

**II.**
**CONCLUSIONS OF LAW AND APPLICATION OF FACTUAL FINDINGS TO THE LAW**

The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(a)(1), as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. Under *Erie Railroad Co. v. Tompkins*,[143] a federal court sitting in diversity jurisdiction applies the substantive law of the forum state.[144] Accordingly, the Court must look to Louisiana law with respect to the claims and defenses asserted in this diversity case.

### A. Louisiana Open Account Statute.

---

[137] *Id.*
[138] Willis, Tr. 157:7-16; 560:4-565:11.
[139] PX-127; Willis, Tr. 62:21-63:3; Koziarski, Tr. 705:12-16.
[140] Koziarski, Tr. 705:21-25.
[141] ECF No. 1.
[142] *Id.*
[143] 304 U.S. 64 (1938).
[144] *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 687 (5th Cir. 1991).

Plaintiff's open account claim is governed by the Louisiana Open Account Statute, La. R.S. 9:2781. Under this statute, an "open account" is "any account for which a part or all of the balance is past due, whether or not the account reflects one or more transactions and whether or not at the time of contracting the parties expected future transactions."[145] To establish a prima facie case for an open account claim, a creditor must prove that the debtor contracted for the sales on an open account and that an account was, in fact, kept.[146] An open account is "similar to a line of credit,"[147] and requires "an ongoing relationship with an extension of credit to the debtor."[148] Louisiana courts use four factors to determine whether a course of dealing qualifies as an open account: (1) whether there were other business transactions between the parties; (2) whether a line of credit was extended by one party to the other; (3) whether there are running or current dealings; and (4) whether there are expectations of other dealings.[149] Once the creditor establishes its prima facie case, the burden shifts to the debtor to prove the inaccuracy of the account or to prove the debtor is entitled to certain credits.[150]

A plaintiff is entitled to attorney's fees for a successful open account claim. To recover attorney fees under the open account statute, a claimant must send a written demand correctly setting forth the amount owed on the open account.[151] Because an award for attorney fees is exceptional and penal in nature, the statute must be strictly construed.[152] The demand letter must correctly set forth the amount due at the time the letter was written.[153]

---

[145] La. R.S. 9:2781(D).
[146] *Premier, Inc. v. GBR Equip., Inc.*, No. 6:10-cv-0627, , 2011 WL 4499428, at *4 (W.D. La. Sep. 23, 2011).
[147] *Hayes v. Taylor*, 812 So.2d 874, 878 (La.Ct.App.2002).
[148] *Salley v. Colonial Marine Indus., Inc.,* 680 So.2d 1242, 1252 (La.Ct.App.1996).
[149] *Paz v. BG Real Estate Servs., Inc*., 921 So.2d 186, 188 (La.Ct.App.2005).
[150] *Metal Coatings, L.L.C. v. Petroquip Energy Servs., L.P.*, 970 So. 2d 695, 698 (La. App. 3 Cir. 2007).
[151] La. R.S. 9:2781.
[152] *Jefferson Door Co., Inc. v. Lewis*, 98-26 (La. App. 5 Cir. 5/27/98), 713 So.2d 835, 837.
[153] *Sears, Roebuck & Co. v. Larose*, 460 So.2d 8 (La. App. 1 Cir. 1984).

Marketplace argues that Peppers failed to send a proper demand letter because the letter sent failed to accurately reflect the credit owed to Marketplace for the glass bottles it supplied—specifically, the number of bottles supplied and the amount of credit due per bottle. In response to Marketplace's argument, Peppers filed its First Amended Complaint, alleging that it was owed $1,376,844.24 but separating out an alleged "undisputed principal amount" owed of $1,047,052.14.[154] Peppers maintains that this amended complaint constitutes a proper demand letter under 9:2781.

The Court finds that Peppers' and Marketplace's business relationship involved "an ongoing relationship with an extension of credit to the debtor" within the meaning of the Louisiana Open Account Statute.[155] Specifically, Peppers provided a product to Marketplace, sent invoices requesting payment, and Marketplace made payments on the accounts. This ongoing relationship involved an extension of credit and occurred over a number of years as reflected in the trial record.

Turning to Marketplace's argument that Peppers' open account claim fails because Peppers' demand letter and initial complaint did not properly credit Marketplace for the bottles they provided, the Court agrees with Marketplace's position. The demand letter credits Marketplace for 790,020 glass bottles and 786,500 caps at the rate of $0.17 per bottle and $0.03 per cap. The Court finds, based on the trial record, that Marketplace sent a total of 1,738,044 bottles to Peppers which Peppers used, either for Marketplace orders or for other customers.[156] Accordingly, the demand letter, as well as the initial complaint filed by Peppers in this case were not accurate.

---

[154] ECF No. 25, ¶¶ 6, 31.
[155] *Salley.,* 680 So.2d at 1252.
[156] The Court addresses the appropriate rate per bottle and cap below.

Peppers attempted to cure the dispute by filing an amended complaint on September 26, 2024, segregating a disputed and undisputed balance.[157]  While LSA-R.S. 9:2781(c) does permit a demand to be made by "citation and service of a petition," the Amended Complaint does not satisfy that requirement as it was not made by citation and service of a petition. As an award for attorney fees is exceptional and penal in nature, the statute must be strictly construed.[158]  Further, at the time that the amended complaint was filed, Marketplace had filed an answer disputing that they owed any amount to Peppers and a scheduling order had been entered by the Court setting the matter for trial. Permitting a party to amend its demand letter in the midst of a highly contested legal proceeding does not fit within the purpose and intent of the Louisiana Open Account Statute. In sum, the Court finds that Peppers is not entitled to recover under the Louisiana Open Account Statute.

## B.  Breach of Contract.

Peppers also seeks recovery from Marketplace based upon breach of contract. Peppers argues that it supplied products to Marketplace pursuant to the purchase orders and that Marketplace breached the contract by failing to pay Peppers for the invoices issued. Marketplace asserts that it did not breach the contract because it did, in fact, make payments on those invoices.

The parties' contractual relationship consisted of purchase orders issued by Marketplace in which it ordered certain quantities of products from Peppers followed by invoices issued by Peppers setting forth the amounts due for the products shipped to Marketplace. Each invoice stated that payments were due within thirty (30) days but nothing in the invoices stated how the payments were to be made—*i.e.* by check or by wire transfer. Prior to August 22, 2022, Marketplace settled

---

[157] *Id*.

[158] *Jefferson Door Co., Inc. v. Lewis*, 98-26 (La. App. 5 Cir. 5/27/98), 713 So.2d 835, 837.

Peppers' invoices using check payments.[159] In August 2022, Peppers required Marketplace to make a payment by wire transfer because of Marketplace's failure to timely pay invoices and because Marketplace's bank had dishonored checks to Peppers. That wire transfer was made by Marketplace as requested. There was no further discussion regarding whether Peppers either required or even expected future payments to be made by wire transfer or if Marketplace could return to making payments by check. The record thus reflects the terms of the contractual relationship: Peppers was to timely produce and deliver the products ordered by Marketplace to Marketplace's facility in Illinois and Marketplace was required to timely pay the invoices representing those shipments of products.

But for the BEC scam that victimized both Marketplace and Peppers, this would be a straightforward breach of contract case. The trial record establishes that Peppers did not receive the payments for the invoices that are the subject of this suit. That is a breach of the parties' contracts. As the record reveals, however, both Peppers and Marketplace were deceived by the imposters' BCE scam, and Marketplace contends that Peppers bears some blame for the diversion of Marketplace's payments to the imposters' bank account. This theme runs throughout Marketplace's contract defenses. But, as explained below, the Court concludes that this line of argument does not support Marketplace's defenses to Peppers' breach of contract claim.

### 1. Discharge Through Payment.

Marketplace first argues that it did not breach the contract because it actually sent, by wire transfer, payments for the invoices. The problem with this argument is that the payments were sent to the third-party imposters who posed as Peppers' representatives. Marketplace's intent to pay Peppers' invoices is irrelevant. Louisiana Civil Code Article 1857 states that "performance must

---

[159] Jt. Stip. ¶ 23.

be rendered to the obligee or to a person authorized by him."[160] In *Dial Real Est. Inc. v. Isbell*,[161] the court held that a party claiming payment must prove both "that payment was made" ***and*** "that the person to whom payment was made had authority to receive it."[162] The Louisiana Supreme Court reinforced this requirement in *Am. Bank v. Saxena*, holding that proof of "actual payment to the creditor" is required to discharge a debt by payment.[163] Here, payments made to the imposters were not payments to the creditor—Peppers. Marketplace cannot, therefore, avoid a breach of contract claim by arguing that the payments to the imposters discharged its debt to Peppers.

### 2. Duty to Disclose Defense.

Marketplace next argues that *Peppers* breached the contract first, and that this breach excused Marketplace's breach. First, Marketplace asserts that Peppers had a "duty to disclose" and cites a line of cases, including *Louisiana State University System Research & Technology Foundation v. Qyntessa Biologics, LLC*,[164] to support its position. Marketplace's reliance on this line of cases is misplaced. These cases address fraud under La. C.C. Art. 1953 and the obligations of parties who hold a fiduciary relationship with one another. Article 1953 provides that: "fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." Marketplace argues that Peppers had a duty to disclose the fraud committed by the imposters. The flaw in this argument is that the record shows that Peppers, like Marketplace, was unaware of the diversion of Marketplace's wire transfers into the account of the imposters.

---

[160] La. C.C. Art. 1857.
[161] 256 So. 2d 133, 136 (La. App. 3 Cir. 1971).
[162] *Id*.
[163] 553 So. 2d 836, 844 (La. 1989).
[164] 168 So. 3d 468 (La. App. 1 Cir. 2014).

Marketplace next argues that Peppers *should have* discovered the BEC scam and alerted Marketplace. Again, this theory does not support a defense to Peppers' breach of contract claim because it is grounded in negligence, not intentional action. Article 1953 and the *Qyntessa Biologics* line of cases require not only an intentional act, but an intentional act made with a bad motives. Marketplace would essentially have to argue that Peppers committed fraud by not discovering the same fraudulent scheme that Marketplace itself had failed to discover. Moreover, a duty to disclose typically exists where the parties stand in some confidential or fiduciary relation to one another.[165] Here, Peppers and Marketplace were engaged in an arms-length commercial relationship between a buyer and seller of goods. Marketplace has not pointed to—nor has the Court found—case law holding that an arm's length commercial relationship gives rise to a confidential or fiduciary relationship. Nor does the record support any such relationship here.

In sum, Marketplace has failed to establish that Peppers breached any terms of their contractual relationship by failing to disclose the BCE scam and preventing the diversion of Marketplace's payments to the imposters.

### 3. Estoppel by "Standing By" Defense.

Next, Marketplace argues that Peppers also had a duty to disclose that (1) it had not changed its banking information and (2) there were phishing attempts aimed at other customers. Marketplace frames this argument as an estoppel by "standing by" theory. Estoppel by "standing by" generally covers any silence where there are both knowledge and a duty to make a disclosure.[166] "Estoppel by silence or inaction is often referred to as estoppel by 'standing by'" and the underlying principle is embodied in the maxim "one who is silent when he ought to speak

---

[165] *Id*.
[166] *See* ECF No. 74, p. 13.

will not be heard to speak when he ought to be silent."[167] Marketplace relies heavily on the Louisiana Supreme Court case of *Parish Nat. Bank v. Ott*.[168] In that case, Parish National Bank ("PNB") sued a husband and wife who were joint signers of a master promissory note.[169] The husband denied responsibility to PNB for amounts drawn on the line of credit because he did not sign any of the draw requests, never authorized his then-wife to sign his name to the draw requests, and was unaware that she was accessing the line of credit until August or September of 1994 and as late as October of 1994.[170] The *Ott* court found that the husband was nevertheless liable for several unauthorized draw requests by his wife after November 1994 because he had discovered that she was forging her draw requests but did not inform the bank.[171] According to the court, the husband was in position to prevent further unauthorized draw requests but remained silent.[172] The court's reasoning was grounded on La. Civ. Code art. 1983, which imposes a good faith requirement on contract performance, and article 1997, which provides that an obligor who acts in bad faith is liable for any damages that are a direct consequence of his or her failure to perform.[173]

The problem with Marketplace's reliance on *Ott* is that mere negligence—that Peppers *should have* known about or detected the BEC scam—does not equate to acting with intent or with actual knowledge. Unlike *Ott*, the trial record here reflects that neither Peppers nor Marketplace were actually aware of the scam involving Marketplace's wire transfers before the wire transfers were diverted. Accordingly, Marketplace's defense of estoppel by "standing by" is inapplicable in the present case.

---

[167] *In re Willis*, 345 B.R. 647, 648 (B.A.P. 8th Cir.2006), fn. 11 (citing *Brixey v. Union Oil Co. of Calif.*, 283 F.Supp. 353 (W.D.Ark.1968))
[168] 841 So. 2d 749 (La. 2003)
[169] *Id*.
[170] *Id*. at 751.
[171] *Id*. at 752, 754.
[172] *Id*.
[173] *Id*.

### 4.   Defense under Article 2003.

Next, Marketplace relies on Louisiana Civil Code Article 2003, which provides that

An obligee may not recover damages when his own bad faith has caused the obligor's failure to perform or when, at the time of the contract, he has concealed from the obligor facts that he knew or should have known would cause a failure.

If the obligee's negligence contributes to the obligor's failure to perform, the damages are reduced in proportion to that negligence.[174]

Marketplace argues that Peppers cannot recover because it concealed from Marketplace facts that it knew or should have known would cause Marketplace's failure to pay. Specifically, Peppers failed to disclose that (1) in August 2022, it did not change its banking information and (2) in October 2022, it learned that John Bulliard's email had been hacked, with the imposters using his and other fraudulent email domains to contact Peppers' customers regarding payment information.[175]

While the text of Article 2003 would appear to support Marketplace's argument that any negligence on the part of Peppers in not discovering the imposters' actions should reduce their recovery, the Louisiana Supreme Court has held that the proportional reduction of damages under Article 2003 applies only when the obligee breaches a contractual obligation. In *Lamar Contractors, Inc. v. Kacco, Inc.*,[176] the court concluded that Louisiana law "does not permit an obligor to invoke [Article 2003's reduced in proportion clause] unless the obligor can prove the obligee itself failed to perform duties owed under the contract."[177] Federal courts have consistently applied this precedent—as they must under *Erie*. The Fifth Circuit in *Apache Deepwater, LLC v.*

---

[174] La. CC. Art. 2003.
[175] *See* ECF No. 74, p. 17.
[176] 189 So. 3d 394 (La. 5/3/16).
[177] *Id*. at 398.

*W&T Offshore, Inc.*,[178] relied on *Lamar* to hold that "the good-faith inquiry in Article 2003 is limited to situations where the obligee has breached."[179] Again, in *Whitney Bank v. SMI Glob. Cos.*,[180] the Fifth Circuit reaffirmed that "*Lamar* prohibits a reduction in damages based on bad faith acts unless the misbehaving party breached the terms of the contract."[181] As the Court has already found that Peppers did not breach any terms of the contract, Marketplace cannot rely on Article 2003.

But even if Article 2003 did apply here, the Court would not reduce Peppers' recovery based on that article. Based on the evidence in the trial record, Marketplace was in the best position to protect itself from the actions of the imposters. Specifically, the diversion of the wire transfers resulted when Marketplace redirected the transfers based on an e-mail from the imposters that was rife with cybersecurity "red flags." For example, the email contained (1) different sizes of fonts; (2) signature lines that did not match the name of sender; (3) a suspect explanation for the need to change the bank wiring instructions; and (4) an indication that "urgent" action was needed. Marketplace had a formal, written cybersecurity policy and provided mandatory annual training to its employees, including CEO Koziarski, COO Pyzikiewicz, and Controller Przybylko.[182] This training specifically instructed them to "always check email addresses," "search for inconsistencies," and be wary of emails even from known senders.[183] All three Marketplace officers admitted they failed to follow these specific, mandated protocols.[184] Further, Marketplace did not confirm the change in wiring instructions by contacting Peppers' representatives. While

---

[178] 930 F.3d 647 (5th Cir. 2019).
[179] *Id*. at 655.
[180] 949 F.3d 196 (5th Cir. 2020),
[181] *Id*. at 211.
[182] PX-125.
[183] *Id*.
[184] Koziarski, Tr. 696:22-697:3, 700:5-6, 702:13-14; Przybylko, Tr. 587:15-21, 600:19-22, 601:2- 3.

28

Marketplace argues that Peppers should have been more diligent in discovering the BEC scam, Marketplace is the party that took affirmative actions resulting in the diversion of the wire transfers to the imposters and was in the best position, at the time, to ensure that the change in wire instructions was legitimate. Accordingly, even if the Court were to undertake the apportionment of negligence analysis that Marketplace requests, the Court would find that Marketplace is entirely responsible for permitting the fraud to transpire.

### 5. The Imposter Rule.

Finally, Marketplace relies on the so-called "imposter rule" to avoid liability. The imposter rule provides that a party that is in a better position to prevent the loss should suffer the loss if they fail to exercise reasonable care.[185] This argument is intuitively appealing because both Marketplace and Peppers were literally victims of "imposters" employing a BEC scam to divert Marketplace's wire transfers. Unfortunately, the formal "imposter rule" as a legal doctrine does not apply here.

The imposter rule is codified in La. Rev. Stat. § 10:3-405—Louisiana's version of Article 3 of the Uniform Commercial Code ("UCC"). This provision expressly applies to *negotiable instruments*, not wire transfers. Nevertheless, Marketplace argues that the Court should extend the imposter rule to the wire transfers in the present case because other courts have applied the rule to fraudulent wire transfers. In this regard, Marketplace cites *Bile v. RREMC, LLC.*[186] *Bile,* however, is inapposite. The *Biles* court specifically held that, while Article 3 of the UCC does not govern contract disputes or wire transfers, "[i]n the absence of contract law directly on point, the Court finds that Article 3 provides guidance for the resolution of this case."[187] But Louisiana is not lacking contract law directly on point as Article 2003 provides the same essential analysis as the

---

[185] *See* ECF No. 75, p. 19.
[186] 2016 WL 4487864, at *6–10 (E.D. Va. Aug. 24, 2016).
[187] *Id*., at *7.

imposter rule and the Louisiana Supreme Court has held that Article 2003 does not apply where there is no breach of contract by the obligee. The Court will not make an end-run around Article 2003 and the Louisiana Supreme Court's limitation of that remedy by importing the imposter rule from Article 3 of the UCC. There is simply no need to apply law regarding negotiable instruments to the present case, even for guidance. Further, as the Court indicated above, even if the Court found that the imposter rule was applicable, Marketplace was in the best position to prevent the diverted wire transfers in this case.

* * *

In sum, the Court finds that Marketplace breached the contract and Peppers is entitled to recover the sum of $1,340,576.41. Peppers is also entitled to recover interest as set forth in the invoices. Although the subject invoices specified an overdue payment charge of 1.5% monthly (18% annually), Louisiana law caps conventional interest at twelve (12%) percent per annum.[188] Peppers is therefore entitled to interest at the maximum lawful rate of 12% per annum on each invoice from the date each payment became due, subject to appropriate adjustment for the credit received in October 2024.

### C. Unjust Enrichment.

Peppers' final alternative theory of recovery is unjust enrichment. Given the Court's conclusion with respect to Peppers' contract claim, the Court denies relief under that theory of recovery.

---

[188] La. Rev. Stat. 9:3500(C)(1); *Gold, Weems, Bruser, Sues & Rundell v. Granger*, 947 So. 2d 835, 846 (La. App. 3 Cir. 2006) (holding that courts must enforce contractual interest rates up to the legal maximum of 12%).

### D.  Credit for Bottles and Caps.

The parties do not dispute that Marketplace is entitled to a credit for the bottles and caps provided to Peppers, but they dispute the calculation of that credit. The record reflects that at certain points during the parties' business relationship Peppers was unable to obtain the bottles and caps necessary to fulfill its shipments to Peppers. As a result, the parties agreed that Marketplace would procure and supply the bottles and caps Peppers needed to fulfill the orders, and Peppers would apply a credit for the cost of those materials. The parties had undertaken a similar course of dealing in the past.

With respect to the disputed credits, Marketplace sought a credit at the rate of $0.28 per bottle, which represented the actual cost to Marketplace in obtaining the materials (glass container plus cap). Peppers sought to negotiate a lower cost. Unfortunately, the record does not reflect whether the parties ever reached agreement on the per unit amount of the credit. Given the parties' course dealing, the lack of agreement on an amount different from the actual cost to Marketplace of the materials, and the fact that Peppers accepted the materials, the Court concludes that Marketplace's actual cost of materials is the appropriate basis to calculate the credit.

Marketplace provided 1,738,044 bottles and 1,772,650 caps to Peppers.[189] These bottles were used by Peppers to fulfill Marketplace's order and also for other customers' orders. Peppers had an excess volume of the bottles supplied by Marketplace because of the end of their business relationship ceased but those bottles and caps were never actually returned to Marketplace. Accordingly, the Court finds that Marketplace is entitled to a credit for the actual cost of procuring the bottles and caps as well as the cost of packaging and delivering the bottles to Peppers. The

---

[189] Marketplace submitted eleven Bill Credits (JX 59-69) setting for the exact number of bottles and caps which were sent and received by Peppers. The total number of bottles was 1,738,044 and the total number of caps was 1,772,650. The evidence established that the actual cost to Marketplace for those items was $0.25 per bottle and $0.03 per cap.

31

Court has reviewed the eleven Bill Credits in the record and concludes that Marketplace is entitled to a credit of **$487,690.50**—$434,511 for the glass bottles and $53,179.50 for the caps.

### III.
#### CONCLUSION

The Court finds that Peppers is entitled to recover damages against Marketplace for breach of contract in the amount of $1,340,576.41, less a credit of $487,690.50 for a total recovery of **$852,885.91**. Peppers is also entitled to interest at the rate of **12% per annum** on each invoice from the date each payment became due, subject to appropriate adjustment for the credit received in October 2024, as well as the credits due to Marketplace for the bottles, which shall be credited based upon the dates on which the bottles were delivered to Peppers. Peppers' request for attorney fees under the Louisiana Open Account Statute is denied. A separate judgment in conformity with the foregoing reasons will be entered into the record.

THUS DONE in Chambers on this 26th day of March, 2026.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE

32